# EXHIBIT D

**U.S. Bank National Association v. Nichols, Slip Copy (2019)**

2019 WL 4276995
Only the Westlaw citation is currently available.
United States District Court, N.D. Oklahoma.

U.S. BANK NATIONAL ASSOCIATION, Plaintiff,
v.
Tonnie Chicke NICHOLS; Boris Bernard Nichols, Defendants.

Case No. 19-CV-482-JED-FHM
|
Signed 09/10/2019

**Attorneys and Law Firms**

Tonnie Chicke Nichols, Tulsa, OK, pro se.

Boris Bernard Nichols, Tulsa, OK, pro se.

Donald J. Timberlake, Baer & Timberlake, Oklahoma City, OK, for Defendants.

### OPINION AND ORDER

JOHN E. DOWDELL, CHIEF JUDGE

*\*1* Before the Court are a Notice of Removal (Doc. 2), Motion for Leave to Proceed *In Forma Pauperis* (Doc. 4), and an Application for Emergency Temporary Restraining Order, Preliminary Injunction, and Declaratory Relief for Wrongful Forclosure [sic]" (Doc. 5).

This action is the latest of five cases filed in this District by Tonnie Chicke Nichols and Boris Bernard Nichols, who are defendants in the removed foreclosure proceeding. (*See* Case Nos. 18-CV-55-JED-FHM, 18-CV-656-JED-JFJ, 19-CV-40-TCK-JFJ, 19-CV-203-JED-FHM, 19-CV-482-JED-FHM). They have attempted to remove the foreclosure case multiple times, without success, and they have unsuccessfully filed claims against the foreclosing bank in an attempt to prevent foreclosure.

Tonnie and Boris Nichols initiated the instant proceeding by filing a "Notice of Removal" of Case No. CJ-2017-1957 from Tulsa County District Court. (*See* Doc. 2 at 1). The Clerk docketed the case as a new civil pleading, apparently because the "Notice" filed by Tonnie and Boris Nichols references alleged claims against the bank. (*See id.* at 7-8).[1] The Court considers their filing another attempt to remove the Tulsa County District Court action, while at the same time attempting to reassert claims in an effort to prevent foreclosure.

The Nichols defendants' prior attempts to remove the foreclosure proceeding have been unsuccessful and were remanded due to untimeliness. United States District Judge Terence C. Kern previously remanded the same Tulsa County case after the Nichols defendants filed an earlier untimely removal of the foreclosure action. (*See* Case No. 19-CV-40-TCK-JFJ, April 4, 2019 Opinion and Order, Doc. 17; *see also id.*, Doc. 28 [Tenth Circuit dismissal of the Nichols defendants' appeal, for lack of appellate jurisdiction] ). After Judge Kern remanded the action, the Nichols defendants filed a second Notice of Removal of the Tulsa County action, in Case No. 19-CV-203-JED-FHM. The undersigned remanded the second removal, determining (as had Judge Kern) that the removal of the foreclosure case was untimely.

The Nichols defendants' request for leave to file *in forma pauperis* (Doc. 4) is **granted**, but their action will be **remanded** for the reasons previously set forth in the prior remand orders by the undersigned and by Judge Kern. (*See* 19-CV-40-TCK-JFJ, Doc. 17, 28; 19-CV-203-JED-FHM, Doc. 9). In short, the Nichols defendants' Notice of Removal in this case was untimely, just as their prior attempts to remove the same Tulsa County foreclosure proceeding were untimely. They have provided no new justification for removal.

In addition, the Nichols defendants' attempt to assert "claims" in their Notice of Removal is procedurally improper. Any such claims would, in any event, be dismissible as frivolous.[2] The gravamen of the claims they reference in their Notice of Removal is the same as before: they argue that the bank did not have standing to foreclose because it was not the original lender. (*See* Order dismissing claims in 18-CV-55-JED, 18-CV-656-JED, Doc. 10). Their principal argument – that they should be relieved of their mortgage under theories that (1) only credit was lent to them and (2) there was a financial crisis created by mortgage-backed securitizations – have been flatly rejected by other courts. *See, e.g., Scarborough v. LaSalle Bank Nat'l Ass'n*, 460 F. App'x 743, 750-51 (10th Cir. 2012) (citing cases). As the court explained in *Ladouceur v. Wells Fargo*, 682 F. App'x 649 (10th Cir. 2017):

**\*2** The Ladouceurs filed the present federal court complaints against Wells Fargo claiming it lacked standing to foreclose on the two properties because it didn't own the security interests in their properties.... [T]he Ladouceurs allege the contracts relating to the securitization of their loans were fraudulent and the deeds of trust were not properly assigned. Consequently, they contend Wells Fargo lacks standing to foreclose on their properties. But as the district court correctly held, the Ladouceurs are not parties to the securitization assignments and have not stated any plausible claim to relief arising out of the assignment of the loan documents. "[S]ecuritization of a note does not alter the borrower's obligation to repay the loan[; it] is a separate contract, distinct from the borrower's debt obligations under the note." Because the Ladouceurs have failed to state a plausible cause of action, we affirm the dismissal of their complaints.

682 F. App'x at 649 (quoting *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 749 (6th Cir. 2014)).

The Nichols defendants' other theories have also been rejected by the courts. *See, e.g., Hodge v. Ocwen Loan Serv.*, No. 11-CV-837-DN, 2012 WL 1434887 (D. Utah Apr. 25, 2012) (dismissing breach of contract, quiet title, declaratory and injunctive relief claims that were premised upon the securitization theory); *see also Heaton v. American Brokers Conduit*, 496 F. App'x 873, 876 (10th Cir. 2012) (rejecting "split-note" and securitization theories); *Hoverman v. CitiMortgage, Inc.*, 11-CV-118-DAK, 2011 WL 3421406 (D. Utah Aug. 4, 2011) (rejecting fraud / misrepresentation theory based upon securitization of a loan: "the great weight of authority from Federal District Courts around the nation ... suggests that securitization of loans does not affect the rights of the lender or servicer of the loan to enforce its rights under the loan").

The Nichols defendants submitted 511 pages of "exhibits" with their Notice of Removal, and they re-filed an "Application for Emergency Temporary Restraining Order, Preliminary Injunction, and Declaratory Relief for Wrongful Disclosure" (Doc. 5), which was initially filed in state court. In the injunction Application, the Nichols defendants contend that they are likely to succeed on the merits because they received an "arbitration award" dated July 11, 2019. (*See id.* at 6). They have provided a purported "Final Arbitration Award," issued by Sitcomm Arbitration Association in their exhibits. (*See* Doc. 3 at 10-37).[3] That document is a bizarre jumble of inconsistent, nonsensical word salad. (*See id.*).[4]

**\*3** The arbitration document purports to award the Nichols defendants a total of $800,000, comprised of $200,000 from each of the "respondents" to the arbitration, who are identified as (1) the plaintiff bank in this case, (2) its CEO, (3) the Attorney General of the State of Oklahoma, and (4) First Mortgage, LLC. The document does not identify any specific wrongdoing or basis for the award. Instead, the "arbitrator" announced that the Nicholses had a prior relationship with the four respondents and formed a contract by making an unspecified counteroffer or "conditional acceptance" to which the respondents somehow "tacit[ly] acquiesce[d]" by failing to respond:

> On or about December 20, 2018, the Claimant [Nichols] and the Respondent(s) entered into a written self-executing, binding, irrevocable, contractual agreement coupled with interests, for the complete resolution of their misconvictions and other conflicts respecting their previous relationship. The Respondent(s) made an attempt to change the terms of that contractual agreement and the Claimant presented a counter offer or conditional acceptance of the offer to the Respondent(s). The record clearly documents that the Respondent(s) have failed to properly respond after they received the counter offer, whereby such nonresponse would equate to tacit acquiescence thereby creating an estoppel respecting the Respondent(s) and any future claims and/or prior claims and/or present claims associated with the instant matter.

(Doc. 3 at 32-33, ¶ 18).[5] While it vaguely references a previous relationship, the document does not include any facts regarding the relationship.

The purported arbitration award is unlike any other this Court has ever seen. It is devoid of any specific fact-finding. While it references a contract dated December 20, 2018, there is no actual discussion of what its terms are, nor does it recite what the consideration or subject matter of the purported contract was, whom the specific parties to the purported contract were, whether

they actually executed any document and, if so, when, and it does not address a method of service or notice, if any, that was given to any of the "Respondent(s)." The only "terms" of the "contract" that are cited are the same "terms" as those in the purported unilateral "conditional acceptance" "contract template" that Sitcomm Arbitration Association makes available on its own website. The arbitrator found that the respondents, through "tacit acquiescence" to an unspecified "counter offer" or "conditional acceptance," gave the Nicholses the right to enforce a "self-executing binding contract coupled with interests," which "stands as irrevocable." (*Id.* at 23-24). Most of the purported arbitration document appears directed toward convincing any court that the award is legitimate and that a court, when requested, must confirm it.

The "arbitration" was apparently initiated by the Nichols defendants on June 20, 2019, and they requested "summary disposition." (*Id.* at 14, ¶ iv; *see also id.* at 35, ¶ 2). That was *after* their numerous attempts to prevent foreclosure were rejected by the state and federal *courts*. On July 11, 2019, twenty-one (21) days after the Nichols defendants initiated the arbitration, the arbitrator allegedly held a hearing "at which time th[e] Arbitrator reviewed all contractual agreements and documentary evidence submitted by the parties in this matter." (*Id.* at 14, ¶ v).[6] The "award" – memorialized in 28 pages of uninformative blatherskite – was entered the same day as the purported hearing.

**\*4** As noted, the arbitrator determined that a contract was formed by a failure to respond to a counteroffer (supposedly made unilaterally by the Nicholses after an existing contract had previously already been formed), which is a legally bizarre determination contrary to hornbook contract law. He also purported to issue the "summary award" of $800,000 because "[t]he Respondent(s) have failed to provide proof that they have not received and/or been notified of the existence of the contract and of their right to waiver." (*Id.* at 22-23, ¶¶ 47, 50).[7] If the "Respondent(s)" had entered into a contract, why would they need "notice" of such a contract? If they did not have notice of the contract and/or the arbitration that was allegedly completed in 21 days, how would they have known they should provide proof? No facts that would substantiate an award of $800,000, or any treble award of $2,400,000, are discussed.

The arbitrator also found that a summary arbitration and award were necessary because of the "time constraints and the paramount danger affecting the public interest, justice, and due process," but there is not a single factual reference that would support any finding that an immediate arbitration award was necessitated by any "paramount danger." (Doc. 3 at 25). The document also contains the following, peculiar announcements by the arbitrator:

> Respondent(s) have waived all rights, claims, defenses, and/or standing respecting the matter and is [sic] estopped from any collateral attacks and/or seeking disposition from any other venue as a result of the knowing, intentional and deliberate consent to the contractual agreement. *It does appear to this Arbitrator that Claimants have come to understand that the United States is operating under an emergency the last 90+ years due to a monetary crisis, with a remedy provided by pledge, and further that the United States is willing and able to meet its "government obligations" per contract except that the United States has been taken over by Private Bankers who only play by established rules when it benefits themselves.* (*Id.* at 23, ¶ 50) (emphasis added).

> The contractual agreement between the parties acknowledges that tax credits are being collected by the lender even though the property was paid for, no loan of actual money was ever made, and the property is owned by the estate so repossessing it is fraud straight up. (*Id.* at ¶ d).

The purported "arbitration award" does nothing to salvage the Nichols defendants' current efforts to prevent foreclosure. It does nothing to undermine the foreclosure proceedings that the Nicholses have tried numerous times to shut down. Even were the "arbitration award" factually and legally grounded, the "contract" referenced therein was allegedly formed on December 20, 2018, months after the foreclosure Judgment was entered. The "arbitration" document does not provide any factual or legal support for the Nichols defendants' request for injunctive relief. Their Application for temporary restraining order and injunction (Doc. 5), which is premised upon the alleged "arbitration award," is thus **denied**.

The Clerk of Court shall remand this action to the Tulsa County District Court, Case No. CJ-2017-1957.

SO ORDERED this 10th day of September, 2019.

**All Citations**

Slip Copy, 2019 WL 4276995

**U.S. Bank National Association v. Nichols, Slip Copy (2019)**

Footnotes

1   While the Nicholses removed this action from state court, they have styled themselves as the plaintiffs in this action. In fact, they are defendants in the underlying action, and the Court will refer to them as the defendants here.

2   Under 28 U.S.C. § 1915(e)(2)(B)(i) and (ii), a court must screen cases filed *in forma pauperis* and must dismiss the case at any time the court determines the action is frivolous or fails to state a claim. This provision "applies to all persons applying for IFP status, and not just to prisoners." *Salgado-Toribio v. Holder*, 713 F.3d 1267, 1270 (10th Cir. 2013).

3   The pages of the "award" were submitted in reverse order, such that the first page is at 37 and the last page is at 10. (*See* Doc. 3 at 10-37).

4   Sitcomm Arbitration Association's website indicates that "Currently we are undergoing some internal restructuring and are currently not accepting any new Arbitration's [sic] however we will be relaunching in September date TBD. During this time we kindly ask for your patience, thank you." See *https://saalimited.com/index.html.* The Association holds itself out as follows:
   We are a small group of individuals who have come together with our unique skills and history to help those who seek to resolve their contractual disputes and other matters in a peaceful setting. Our goal in [sic] our aim is to help individuals reduce the burden on government, their courts, and their other administrative agencies. *One way we do this is by helping the consumer with a preformatted generalize [sic] contract that includes all of the elements necessary for enforcement.* As was brought out by the state of New Hampshire, *the corporate state officials have by their silence deceived the American people, we are attempting to help balance or right the wrong/ship.*
   How we help: The Sitcomm Arbitration Association Provide [sic] several services, including electronic arbitration, where the arbitration is conducted completely based on the record. This requires that the arbitrator document there [sic] reviewing the entire contract. For the less extensive contracts it is $100 an hour with a two hour minimum payment, plus services, plus fees, plus costs. Please review our program prices on our homepage for more details on this.
   *See https://saalimited.com/More%20about%20us.html* (emphasis added).

5   Sitcomm Arbitration Association's website provides the "Contract Templates" that are available to its customers to make the purported "counter offer" or "conditional acceptance" that the arbitration decision then purports to enforce. *See https://saalimited.com/page6.html* ("The Contracts"). The templates include an arbitration provision, the term "tacit acquiescence," and a significant amount of other legal-sounding gibberish which is repeated in the arbitration "award."

6   The document repeats the same paragraph multiple times in less than a page of text: "The arbitration hearing was held on July 11, 2019 at which time this Arbitrator reviewed all contractual agreements and documentary evidence submitted by the parties in this matter." (Doc. 3 at 14, ¶ iii; *id.* at ¶ iv; *id.* at 15, ¶ 5).

7   The "award" also provides that "IF AFTER 30 DAYS ANY RESPONDENT HAS NOT PAID, THIS ARBITRATOR AWARDS THREE TIMES THE ASSESSMENT PER UNPAID RESPONDENT, POTENTIALLY, THIS MAKES THE AWARD TWO MILLION FOUR HUNDRED THOUSAND DOLLARS." (Doc. 3 at 18) (capitalization in original).

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.